This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

No. A-1-CA-37131

**SHANI L. MADDEN,**

Petitioner-Appellant,

v.

**DOUGLAS M. SMITH,**

Respondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Victor S. Lopez, District Judge**

Stalter Law LLC
Kenneth H. Stalter
Albuquerque, NM

for Appellant

Sutin, Thayer & Browne
A Professional Corporation
Mariposa Padilla Sivage
Lynn E. Mostoller
Christina M. Looney
Albuquerque, NM

for Appellee

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}** Shani L. Madden appeals the district court's judgment entering a final decree dissolving her marriage to Douglas M. Smith. We consider whether the court erred by (1) refusing to order the production of confidential records by two non-party companies—records containing data underlying the court-appointed expert's opinion;

(2) denying Madden spousal support; (3) denying Madden attorney fees under NMSA 1978, Section 40-4-7 (1997); and (4) failing to disclose what Madden alleges is a conflict of interest. We affirm.

## BACKGROUND

**{2}** Madden and Smith were married for nearly five years before Madden petitioned for divorce. During the marriage, Madden was voluntarily unemployed or underemployed. Smith had been paying her $4,000 per month plus the cost of health insurance for herself and her children and her car insurance. These payments, in that or an increased amount, continued throughout the litigation.

**{3}** There were no children from the marriage, so the matters litigated pertained to the division of assets and debts and the award of interim support, spousal support, and attorney fees. The case went to trial almost four years after it began. Several of the district court's pre-trial procedural rulings are the subject of this appeal. More detail on those rulings and on this appeal's other issues is provided below as appropriate.

## DISCUSSION

**{4}** Before we address the issues, we set forth some of the overarching principles guiding our review. First, we presume the district court's rulings are correct. *See Firstenberg v. Monribot*, 2015-NMCA-062, ¶ 57, 350 P.3d 1205. Madden, as the appellant, bears the burden to clearly demonstrate that the district court erred. *See id.* Second, the district court abuses its discretion "when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

## I.  Discovery of Confidential Third-Party Records Used by the Court-Appointed Expert

**{5}** Smith entered the marriage with ownership interests in several companies, including NanoCool, NanoPore, and NanoGroup (collectively, the Nano Companies). Smith acknowledged he was the "operating individual" for the companies.

**{6}** In her divorce petition, Madden alleged she was entitled to a share of the community property from the marriage, including a portion of Smith's interests in the Nano Companies. Madden contends the district court erred when it refused to allow her access to the QuickBooks files that NanoCool and NanoPore[1] provided to a court-appointed expert.

## A.  Procedural Background

---

1NanoGroup was not party to this particular dispute because it did not possess the QuickBooks files at issue.

**{7}** Recognizing that the disclosure of certain information about the Nano Companies could harm the companies' interests by, among other things, violating their nondisclosure agreements with third parties, the parties agreed to the entry of a stipulated order (the Confidentiality Order) early in the litigation, sealing the record insofar as it revealed the Nano Companies' confidential information. Subsequent to its entry of the Confidentiality Order, the district court appointed an accountant, Henry South, to serve as a Rule 11-706 NMRA expert to determine the value of the community property interest in the Nano Companies. Meanwhile, Madden hired her own accountant, Margi Palmer, as an expert to value the companies.

**{8}** Madden served subpoenas on NanoCool and NanoPore to produce records relevant to Ms. Palmer's determinations. In response, Smith filed a motion to quash Madden's subpoenas and for a protective order. Following a hearing, the district court concluded that the information Madden sought was relevant to the case and denied Smith's motion to quash the subpoenas. The denial order instructed Madden to re-issue her subpoenas to narrow the evidence sought and to add her request for the companies' QuickBooks files. NanoCool and NanoPore moved to quash the re-issued subpoenas, arguing that the requested material—general ledger detail in QuickBooks format—was "protected and confidential" and that disclosing it would cause it to violate its nondisclosure agreements. NanoCool attached an affidavit to support its claims, while NanoPore did not. Madden responded that production was appropriate because the Confidentiality Order protected NanoCool and NanoPore by preventing any party from disclosing any of the requested information. NanoCool and NanoPore took exception to that contention in their respective replies.

**{9}** The district court amended its previous order regarding the production of documents related to the Nano Companies, ordering NanoCool and NanoPore to turn over certain records (1) to the court for in camera review; and (2) unless the companies objected, to Mr. South and Madden. The companies complied with the first part of the order, but objected to producing the documents to Mr. South or Madden, arguing that Rule 1-045(C) NMRA protected against production. Madden then requested hearings to determine how Mr. South and the court could review, and she could see a summary of, the records. The companies renewed their objections to the court order.

**{10}** Without a ruling on the matter, resolution of the discovery dispute stalled. To overcome this predicament, the parties, NanoCool, and NanoPore agreed to a stipulated order (the Stipulated Production Order) providing that the companies would give the records, including the QuickBooks files, to Mr. South only for his review. The Stipulated Production Order further directed that Mr. South was not to disclose the records "to either [Madden] or [Smith] or their counsel" except by court order. Mr. South completed his valuation and determined that the Nano Companies' collective value decreased during the marriage.

**{11}** Despite agreeing that Mr. South was not to disclose the records absent a court order, Madden tried to access them by deposing Mr. South, instructing that "Mr. South is requested to bring all documents used to produce his valuation of companies . . .,

including those documents produced In Camera under the Stipulated [Production] Order." The Nano Companies moved to quash the deposition notice. Madden responded, again arguing that the Confidentiality Order made production proper. Less than three weeks before trial, the district court heard argument on the motion to quash. Notwithstanding Madden's repeated requests that the court order production of the QuickBooks files to her, the court granted the motion and ordered that "Mr. South shall continue to be bound by the . . . [S]tipulated [Production O]rder, and shall not disclose the materials he received . . . to the parties or their counsel."

## B.    Analysis

**{12}**    Madden argues generally that the district court's ruling was error. We begin by noting that we review the ruling for an abuse of discretion, *see Vanderlugt v. Vanderlugt*, 2018-NMCA-073, ¶ 30, 429 P.3d 1269, and that "[a]lthough the rules favor allowance of liberal pretrial discovery," a district court may limit discovery. *Id.* (internal quotation marks and citation omitted). Before turning to the central question of whether the court erred in limiting discovery, we address some of the points Madden makes in support of her allegation.

**{13}**    Madden first argues that the district court erred by finding that production to her "would jeopardize [NanoCool's and NanoPore's] business interests." She specifically claims there is insufficient evidence of the "text, terms, scope, and timing" of what she refers to as the "alleged" nondisclosure agreements for the court to have determined that disclosure of the data she requested would violate the nondisclosure agreements or harm the companies' interests. She points out that only NanoCool, and not NanoPore, supplied an affidavit supporting that conclusion.

**{14}**    There are two related problems with this argument. First, Madden failed to argue below that some of the underlying facts and data she requested were beyond the scope of the agreements, despite having had ample opportunity—in her responses to the companies' objections, for instance—to do so. This is problematic because "we review the case litigated below, not the case that is fleshed out for the first time on appeal." *In re T.B.*, 1996-NMCA-035, ¶ 13, 121 N.M. 465, 913 P.2d 272. Madden's argument to the district court was that production of the QuickBooks files to her was proper because the Confidentiality Order prevented her from revealing information in them, not that such production was proper because the files did not contain information made confidential by the nondisclosure agreements.

**{15}**    Second, Madden's actions below undermine her present insinuation that the agreements did not exist. She repeatedly affirmed the agreements' existence, first by entering into the agreement memorialized by the Confidentiality Order recognizing them. She then acknowledged them in a motion stating, "There is nothing that [] Smith has done for the marital community's income and assets that . . . does not involve nondisclosure agreements with vendors and customers." By affirming the agreements' existence, Madden contributed to what she now perceives as a shortcoming in the district court's ruling; she "should hardly be heard to complain about [that] shortcoming[]

on appeal." *Cordova v. Taos Ski Valley, Inc.*, 1996-NMCA-009, ¶ 13, 121 N.M. 258, 910 P.2d 334. For these reasons, we disregard Madden's complaint of insufficient evidence.

**{16}** Referring to the district court's finding that the QuickBooks files contained "confidential and privileged" information, Madden next disputes that the information was privileged. Yet even if it was not, this point is immaterial. The companies did not claim an evidentiary privilege, *see* Rule 11-501 NMRA, but rather argued protection under the subpoena-related Rule 1-045 NMRA.

**{17}** Rule 1-045(C)(3)(b)(i) allows a court to shield "confidential research, development or commercial information" from discovery. Such confidential information was the basis for the companies' objections. It was also a basis for the district court's ruling, and we see no reason to deem it an improper one. That the court also described the information as "privileged" matters not, as only one proper basis for a ruling is needed. *See Gonzales v. Lopez*, 2002-NMCA-086, ¶ 17, 132 N.M. 558, 52 P.3d 418. We thus disregard the privilege question Madden raises.

**{18}** We next address the series of assertions Madden makes about the prejudice she suffered as a result of the district court's denial of access to the QuickBooks files. These arguments generally focus on the consequences of the district court's refusal and the rule, as she puts it, that "reversal is required if Madden was prejudiced by the district court's rulings." In support of this proposition Madden relies on *Doe v. Roman Catholic Diocese Boise, Inc.*, 1996-NMCA-057, ¶ 21, 121 N.M. 738, 918 P.2d 17. We read *Doe* to more accurately stand for the proposition that a district court may reasonably limit discovery, and when it does, there is no abuse of discretion where the complaining party does not show resulting prejudice. *See id.* ¶¶ 21-22 (citing *DeTevis v. Aragon*, 1986-NMCA-105, ¶¶ 3-11, 104 N.M. 793, 727 P.2d 558 (affirming the district court's order denying discovery of items supplemental to what was "sufficient," where the requesting party failed to point out how the denial prejudiced her)); *accord Blake v. Blake*, 1985-NMCA-009, ¶ 27, 102 N.M. 354, 695 P.2d 838 ("Absent a showing of prejudice, we will not find abuse of discretion."). *Doe* does not demand that we deem the district court's decision error; rather, it calls on us to consider whether that decision was contrary to logic and reason. *See* 1996-NMCA-057, ¶¶ 21-22.

**{19}** We turn now to that key question: whether the district court's refusal to order disclosure of the QuickBooks files to Madden was an abuse of discretion. We agree with the parties that *Blake*, also a divorce case, is instructive here. *Blake* concerned a subpoena demanding the production of corporate records by a non-party company, some of whose shares the husband controlled. 1985-NMCA-009, ¶¶ 1, 4, 18. Like here, the wife sought the records to acquire information on the husband's earnings. *See id.* ¶ 11. The district court ultimately found that the subpoena was unreasonable, oppressive, and overly broad, and quashed it. *See id.* ¶ 18.

**{20}** *Blake* recognized that courts in such circumstances are strained by competing considerations: "the requesting party's need for information to adequately present his or her case, coupled with the court's obligation to make an informed decision"; and the

corporate entity's and shareholders' "legitimate interest in the privacy of their business affairs" and their right to freedom from "unreasonable harassment, disadvantage and expense." *Id.* ¶ 14. *Blake* sought to balance these considerations. It reversed the district court and instructed it on remand to fashion a middle-ground solution—a refinement of the subpoena—that would protect the company's interests. *See id.* ¶¶ 22-23.

**{21}** Bearing in mind, then, that courts resolving discovery disputes between a party and a non-party corporation should strive to tailor their discovery orders so as to avoid harming the various interests at stake, we take a closer look at the facts here. At the hearing, Madden argued that her expert, Ms. Palmer, needed the QuickBooks files to perform her valuation of the Nano Companies.

**{22}** Counsel for NanoCool and NanoPore, Benjamin Feuchter, maintained that disclosing the files to Madden, or even to just Ms. Palmer—persons "outside the court"—would expose the companies to liability arising from their nondisclosure agreements. The district court pressed Mr. Feuchter and Madden for a middle-ground solution. Mr. Feuchter said he believed that giving the files to Mr. South, "an arm of the court," was such a solution. Madden did not offer any solution of her own.

**{23}** Meanwhile, Smith argued that Madden had in fact received the information Ms. Palmer needed. Smith said that Mr. South's report, provided to Madden, contained a QuickBooks files summary. Smith also said that much of the information in the QuickBooks files and on which Mr. South relied had been given to Madden—but that Madden had failed to provide the information to Ms. Palmer. Smith added that Mr. South and Ms. Palmer both testified that the valuation could have been performed without the QuickBooks files. Relatedly, Mr. Feuchter agreed that production of the QuickBooks files were unnecessary, saying that all the "generalized top-level financial information" had been disclosed to Madden, and that what Mr. South did was verify the consistency of QuickBooks files data with that "top-level" information. Smith commented that Mr. South testified that there were no discrepancies between the two sets of data.

**{24}** Given this background, we do not see how the district court erred by declining to order the production Madden sought. The parties' and companies' agreement, memorialized in the Stipulated Production Order, constituted the type of "middle-ground" solution contemplated in *Blake*. By following this course—which Madden once advocated for—the companies' interests in confidentiality were upheld while the parties' interests in moving the case forward through the use of a neutral expert were met.

**{25}** Moreover, it is not clear that Madden was completely deprived of the records needed to make her case, as was the wife in *Blake*. The district court was informed that Madden received what was needed to perform the valuation and adequately cross-examine Mr. South. Madden did not refute that assertion below, nor does she here. "Where it appears that the party requesting discovery has already been granted sufficient information, discovery may properly be denied or limited." *DeTevis*, 1986-NMCA-105, ¶ 11. It appears that Madden was granted sufficient information, and so the district court's refusal to order production of that information in the specific QuickBooks

format was not error. *Cf. id.* (identifying no error where the complaining party failed to show how it was prejudiced by the denial of additional discovery); *Vanderlugt*, 2018-NMCA-073, ¶ 31 (same).

**{26}** Nor has Madden established that the district court was obligated to grant her request. She has not, that is, supported her assertion that "the disclosure obligation extends to any facts or data considered by the expert in forming the opinions to be expressed[.]" Our rules on the subject are not so broad. Rather, Rule 1-026(B)(6)(a) NMRA allows a party to "discover the identity of each person the other party may call as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Though the rule does not prohibit the voluntary or ordered production of data underlying an expert's testimony, it also does not strictly require that production. *New Mexicans for Free Enter. v. City of Santa Fe*, 2006-NMCA-007, ¶ 69, 138 N.M. 785, 126 P.3d 1149 (providing that "under Rule 1-026 all of the data underlying [the expert's] report need not have been provided to [the p]laintiffs").

**{27}** Rule 11-706(B)(1), meanwhile, requires a court-appointed expert to "advise the parties of any findings the expert makes[.]" We are not aware of, and Madden does not point us to, any authority dictating that such "findings" necessarily includes the data underlying them.

**{28}** In an apparent acknowledgment that our discovery rules do not necessarily require the production of data underlying the grounds for an expert's opinion, Madden proposes that we adopt the federal rule so requiring. Madden cites *Biestek v. Berryhill*, ___ U.S. ___, ___, 139 S. Ct. 1148 (2019), for this proposition. That case, in turn, cites Federal Rule of Civil Procedure 26(a)(2)(B). *See Biestek*, 139 S. Ct. at 1154. But the federal rule does not apply to court-appointed witnesses. *See* Fed. R. Civ. P. 26(a)(2)(A), (B). Furthermore, it contains a relevant exception: the data considered need not be disclosed if the court, as here, orders otherwise. *See* Fed. R. Civ. P. 26(a)(2)(B).

**{29}** Having considered Madden's contentions in light of the record, we are not persuaded that the district court erred by refusing to order the production of the QuickBooks files to Madden. As discussed, the court was not obligated to order that production; rather, doing so was within its discretion under Rule 1-045(C)(3)(b). There were suggestions, unrefuted by Madden, that she received what her expert needed. We cannot say that the court's decision was clearly contrary to logic and reason when considering both the companies' interest in avoiding the breach of their nondisclosure agreements and Madden's interest in adequately presenting her case. The district court did not abuse its discretion in denying Madden access to the requested QuickBooks files.

## II.    Denial of Spousal Support

**{30}** Madden next contends that the district court erred in regard to her spousal support claim, made pursuant to Section 40-4-7(E). We understand Madden to challenge the order granting Smith's motion in limine to exclude evidence offered to support the claim. Despite having granted that motion, and in spite of Madden's failure to include the claim in the pre-trial order defining the issues heard at trial, *see* Rule 1-016(E) NMRA, the court nevertheless allowed Madden to argue for spousal support. The court ultimately ruled against Madden in its final order, which is the other order we understand Madden to challenge.

**{31}** Insofar as Madden argues that the denial on the merits of her spousal support claim was an abuse of discretion, her argument consists only of a contention that the district court failed to consider all of the spousal support factors. But this contention is undermined by the court's explicit statement to the contrary in the final order: "Taking into account the factors that should be considered . . . when determining whether to order spousal support, as set forth in [] Section 40-4-7(E) and *Michelson v. Michelson*, 1974-NMSC-022, ¶ 8, 86 N.M. 107, 520 P.2d 263, [Madden] has not demonstrated a need for spousal support." In light of our presumption in favor of the district court's ruling and this statement by the court, Madden has not clearly demonstrated that this denial was error.

**{32}** We turn next to the order granting Smith's motion in limine. Because Madden's challenges to the district court's ruling on the motion overlook her ultimate failure to identify grounds for a spousal support award, as described below, we decline to review the ruling.

**{33}** In her petition, Madden requested spousal support, but identified no factual grounds for it. Smith maintains, and Madden does not dispute, that she identified those grounds in an interrogatory answer. Specifically, Smith states that Madden's response stated that she had "significant and debilitating psychological conditions" preventing her from working.

**{34}** With the understanding that Madden's psychologically based inability to work was the ground for her spousal support claim, the district court appointed an expert psychologist to evaluate her and issued several orders requiring her to produce her medical records to the court-appointed expert and to Smith. Also with this understanding, Smith filed motions to appoint the expert and to meet with him. Throughout the discovery period, Madden gave no indication that the court's and Smith's understanding was incorrect. When Madden failed to produce her medical records to Smith, Smith filed the motion in limine to exclude evidence supporting Madden's spousal support claim. At a hearing on Smith's motion held shortly before trial, Madden announced she had a job. With this announcement, Madden abandoned her claim that she had "significant and debilitating psychological conditions" preventing her from working.

**{35}** Insofar as Madden now argues that (1) the discovery orders were overbroad, and (2) the district court's privilege-related conclusion underlying them was incorrect, her

arguments do not persuade us. Once Madden announced she had a job, she was no longer in a position to claim she was unable to work, thus eliminating Smith's need to defend against her claim by examining the records at issue. The discovery orders thus became irrelevant, and so Madden's attack on them now is misguided. That is, even if we agreed with Madden on these points and reversed the orders, that reversal would have no effect on the case, given Madden's abandonment of her inability-to-work claim. These arguments are moot.

**{36}**   In short, we will not review the motion in limine in light of Madden's ultimate failure to establish a claim that could properly serve as the subject of such a ruling. To the extent that the district court elected to entertain Madden's arguments on spousal support even in the absence of such a claim, Madden has not persuaded us that the resulting ruling was error.

### III.   Order Denying Madden's Request for Attorney Fees

**{37}**   Madden claims error in the district court's denial of her summary judgment motion seeking attorney fees under Section 40-4-7(A). That statute provides that in a divorce proceeding, "[t]he court may make an order, relative to the expenses of the proceeding, as will ensure either party an efficient preparation and presentation of his case." *Id.* We review the denial of a request for attorney fees under Section 40-4-7(A) for an abuse of discretion. *See Garcia v. Jeantette*, 2004-NMCA-004, ¶ 15, 134 N.M. 776, 82 P.3d 947.

**{38}**   The "central purpose" of an attorney fee award under Section 40-4-7(A) is "to remedy any financial disparity between the divorcing parties so that each may make an efficient and effective presentation of his or her claims[.]" *Id.* ¶ 19. Further, the "primary test" to determine whether such an award is warranted is "a showing of economic disparity, the need of one party, and the ability of the other to pay[.]" *Quintana v. Eddins*, 2002-NMCA-008, ¶ 33, 131 N.M. 435, 38 P.3d 203 (internal quotation marks and citation omitted).

**{39}**   Madden's claim is rooted in the following facts. Madden asked for attorney fees in her petition. Around the time Madden filed her petition, Smith agreed to continue paying her the support he was providing during the marriage. A few months into the case, Madden moved for attorney fees and costs necessary for litigation. Before ruling on the motion, the district court ordered an increase in Smith's interim support payments and specified that a portion of it was for minimum attorney fee payments. The court later found that (1) an economic disparity between the parties was apparent in the record; (2) Smith's interim support payments were "to help address" the parties' income disparity; and (3) since a complete financial record had not been established, an attorney fee award was premature. The court indicated it would rule on the fee-award question after hearing the results of a cash-flow evaluation. According to Madden, this evaluation never occurred.

**{40}** About two and a half years after the district court commented on the economic disparity, Madden filed the motion at issue. The court denied it, concluding that (1) the motion was untimely under the Rule 1-016 scheduling order; and (2) "[t]here is no applicable legal authority for the proposition that this [c]ourt is to advance [Madden]'s legal fees and expenses or award same prior to a final ruling in this case."

**{41}** Madden challenges the two stated bases for denial. Regarding the first, she does not allege that the motion was timely filed, but rather says that she requested attorney fees at the beginning of the case, and that "the original request was still pending." We take this to mean that she does not dispute that the motion was untimely filed; consequently, she is bound by that finding. *See Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶ 18, 115 N.M. 181, 848 P.2d 1108. Likewise, Madden does not argue that it is improper for a court to deny a motion due to its untimely filing. We therefore presume that this aspect of the district court's rationale was correct.

**{42}** Even if, as Madden argues, the second basis for denial constituted a faulty conclusion of law, that circumstance would not be enough to characterize the ruling as an abuse of discretion. This is because the first basis was proper, and only one proper basis for a ruling is needed. *See, e.g., Gonzales*, 2002-NMCA-086, ¶ 17. Accordingly, the district court did not abuse its discretion in denying the motion. *See id.*

**{43}** We briefly address two of Madden's attempts to cast doubt on that conclusion. First is her contention that the request could not have been untimely since her prior request was still pending. But the request was not still pending; it was at least partly fulfilled through the attorney-fee payments Smith was ordered to make. What was pending was the district court's final decision on the matter, and that determination in turn depended on the cash-flow evaluation that evidently never occurred. In light of these circumstances, Madden needed to take further initiative before receiving an award, a reality even she—by filing her summary judgment motion—seemed to implicitly acknowledge. That initiative ultimately failed for its untimeliness.

**{44}** Madden then argues that the denial was improper in light of the district court's observation on economic disparity. Madden seems to reason that, because the court once found economic disparity, it was required to advance attorney fees to Madden. But economic disparity is not all that is needed for a Section 40-4-7(A) award; also needed is a finding of Smith's ability to pay. *See Quintana*, 2002-NMCA-008, ¶ 33. The court apparently never made this finding. Furthermore, and lastly, this argument overlooks the reality that the economic disparity was susceptible to change. The court found at trial that the more than five years of interim support payments rectified the parties' income disparity. All else being equal, this leveling of income would necessarily have closed the parties' economic gap.

**{45}** Altogether, these circumstances show that Madden's original request for attorney fees became stale as the case progressed. To revive it, she needed to make a timely request and show that all elements of the test for an award under Section 40-4-7 were

met. She failed to do this. Thus, Madden has not demonstrated that the district court clearly erred in denying her motion for an attorney fee award.

## IV.    Judicial Conflict of Interest

**{46}**    Madden next claims that the undisclosed conflict of interest of the judge who presided over the trial threatened her right to procedural due process. Madden refers to the fact, which Smith concedes, that an attorney representing Smith previously represented the judge in a lawsuit to which the judge was a party.

**{47}**    The attorney at issue acknowledges the following. The lawsuit was a workers' compensation case. The district judge here was one of that case's several defendants, and the attorney worked for the law firm representing them. Under another attorney's supervision, she drafted a notice to remove the case to federal court and a motion to dismiss the case. She then left the firm a little more than two months after the lawsuit began. The first time she met the district judge on this case was in 2015, when she appeared before him.

**{48}**    This issue was not preserved for appellate review. Madden argues that we should nevertheless review it as an exception to our preservation rule, Rule 12-321 NMRA. But no exception applies here. *See Muse v. Muse*, 2009-NMCA-003, ¶¶ 55-57, 59-60, 145 N.M. 451, 200 P.3d 451 (rejecting the argument for a fundamental right exception to the preservation rule based on alleged judicial bias in a divorce proceeding).

**{49}**    Even if the issue were preserved, we would not be persuaded by Madden's implicit claim that her right to have the case adjudicated by a disinterested and impartial trier of fact was violated. That is, she "does not set out any facts to support [that there was] bias" in the proceedings. *Id.* ¶ 58; *cf. Reid v. N.M. Bd. of Exam'rs of Optometry*, 1979-NMSC-005, ¶¶ 7-9, 92 N.M. 414, 589 P.2d 198 (concluding that where a trier of fact admitted to making a statement indicating his bias and prejudgment of the issues, the party's right to procedural due process was violated).

**{50}**    Nor would we be persuaded by what is left of Madden's argument: her Rule 21-211 NMRA-based claim that the district judge should have disclosed information that the parties or their lawyers might "reasonably consider relevant to a possible motion for disqualification," even if he saw no basis for disqualification. *See* Rule 21-211 comm. cmt. [8]. The district judge could only so disclose if he knew of this claimed conflict. Madden gives us no reason to suspect he did, and the attorney's account strongly suggests he did not. *See State v. Harris*, 1997-NMCA-119, ¶ 14, 124 N.M. 293, 949 P.2d 1190 (implying that cognition of one's partiality, as derived from one's "conscience and discretion," attends the recusal decision).

**{51}**    Accordingly, we reject Madden's contention that reversal is warranted under her theory that her right to have an impartial trier of fact preside over her case was violated.

**V.      Cumulative Error**

**{52}**    Madden lastly argues that "the cumulative impact of the district court's errors denied [her] a fair trial." She cites *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 57, 127 N.M. 47, 976 P.2d 999, for the principle that "[r]eversal may be required when the cumulative impact of errors during a trial is so prejudicial that a party was denied a fair trial." Here, as in *Coates*, "no prejudicial errors or irregularities exist in the points raised on appeal[.]" *Id.* Reversal is therefore not called for. *See id.*

**CONCLUSION**

**{53}**    We affirm.

**{54}    IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**JENNIFER L. ATTREP, Judge**